FILED & JUDGMENT ENTERED
David E. Weich

May 05 2006

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
George R. Hodges
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **PLEJ'S LINEN SUPERMARKET** | ) | Case No. 05-35484 |
| **SOEAST STORES LLC, et al.,** | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| **OFFICIAL COMMITTEE OF** | ) | |
| **UNSECURED CREDITORS,** | ) | Adv. Proc. 06-3018 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **WELLS FARGO RETAIL FINANCE,** | ) | |
| **LLC, and SPECIALTY** | ) | |
| **INVESTMENT I LLC,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS**

This matter is before the court on (1) the Motion to Dismiss the Complaint filed by defendants, Wells Fargo Retail Finance, LLC, ("Wells Fargo") and Specialty Investment I LLC ("Specialty Investment") and (2) the response and Motion for Summary Judgment filed by the Official Committee of Unsecured

Creditors (the "Creditors' Committee"). The court has reviewed all of the papers filed by the parties and is persuaded by the argument and authorities of the defendants that there are no factual issues to be determined and that defendants are entitled to judgment in their favor.

## BACKGROUND

1. The debtors, Plej's Linen Supermarket Soeast Stores, LLC, and related entities ("Plej's"), filed their first Chapter 11 case in 2004. Pursuant to the terms of a Loan and Security Agreement (the "Loan Agreement"), Wells Fargo and Specialty Investment (the "Lenders") funded Plej's operations and reorganization plan by providing loans of over $8 million. That funding was the sole source of the dividend paid to unsecured creditors in the first case. Wells Fargo was agent for the Lenders under the terms of the Loan Agreement (in such capacity, the "Agent").

2. Pursuant to Section 5.1 of the Loan Agreement, the Agent was granted, for the benefit of itself and the Lenders, a continuing lien and security interest in "all currently existing and hereinafter acquired or arising Collateral". The Loan Agreement defines "Collateral" as including, without limitation, all "General Intangibles," "Accounts" and "Accounts Receivable," "Leasehold Interests" and "proceeds" thereof. "General Intangibles" and "Accounts and Accounts Receivable" have the

2

meaning ascribed those terms in the Uniform Commercial Code as in effect in Massachusetts.

3. The Agent properly perfected its liens and security interests by recording UCC-1 financing statements. The Creditors' Committee does not contest this fact.

4. These liens were recognized and approved in a number of Orders, most important in the Final Order Granting Debtors' Emergency Motion for Interim Relief Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code Authorizing (A) Use Cash Collateral; (B) Grant of Adequate Protection; and (C) Request for a Final Hearing Thereon (the "Cash Collateral Order") entered November 17, 2005.

5. The Cash Collateral Order granted the Agent and the Lenders a Replacement Lien in all of the debtors' assets, including, without limitation, "accounts," "contract rights," "general intangibles," "payment intangibles" and "proceeds" thereof. The Replacement Lien was granted "without regard to whether [the asset was] acquired prior or subsequent to the Petition Date."

6. The Loan Agreement also included an early termination provision which required payment of a fee in the event the revolving line of credit was terminated prior to maturity. Pursuant to the Loan Agreement, the early termination fee was calculated based upon the following sliding scale: 3% times the

Revolving Credit Ceiling if termination of the revolving line of credit occurred in the first year; 2% if termination occurred in the second year; and 1% if termination occurred in the third year.

7. After consummation of the first Chapter 11 reorganization case, Plej's found it necessary to file a Chapter 11 liquidation case in October 2005. Thus, the revolving line of credit was terminated prior to maturity, and the early termination provision has become effective. Under the present circumstances the early termination fee due the Lenders is $250,000.

8. The debtors have liquidated their assets and project a distribution that will pay all administrative, priority and secured (the Lenders) claims in full; pay the early termination fee; and pay unsecured creditors a dividend of between 3.2 and 9.9%. Because the Lenders' secured claim will be paid in full, the Creditor's Committee seeks by its Complaint to invalidate the early termination provision.

9. Simultaneous with filing the Chapter 11 liquidation case, the debtors filed a Motion of Debtors Pursuant to Sections 105, 363, 365 of the Bankruptcy Code for Authorization (A) To Assume an Agency Agreement with Gordon Brothers Retail Partners, LLC; (B) To Continue the Conduct of Store Closing Sales; (C) To

Sell Assets Free and Clear of Liens and Other Interests (the "Motion to Assume").

10. In the Motion to Assume, the debtors explained the need for a prompt and orderly liquidation in order to maximize the value of the assets. In that regard, the debtors entered into an Agency Agreement with Gordon Brothers Retail Partners, LLC ("Gordon Brothers") following a prepetition auction the debtors conducted of the right to liquidate the debtors' inventory and to sale the debtors' lease rights. In their Motion to Assume, the debtors indicated that the Creditors' Committee and its counsel participated in all aspects of the auction and ultimate selection of Gordon Brothers. The court approved the debtors' assumption of the Agency Agreement on October 18, 2005.

11. Pursuant to the terms of the Agency Agreement, Gordon Brothers was authorized to augment the debtors' inventory with goods supplied by Gordon Brothers (the "Augment Goods"). Gordon Brothers agreed to pay the debtors 6% of the gross proceeds generated by the sale of the Augment Goods as compensation for the right to sell them. The proceeds from the sale of Augment Goods totaled $300,000.

12. In addition to the Motion to Assume, the debtors filed a Motion to Approve Agreement with Anna's Linens, Inc. to Purchase, Subject to Higher and Better Bids, Lease Designation

5

Rights with Respect to Debtors' Non-Residential Real Property Retail Leases and Request for Hearing on Shortened Limited Notice (the "Motion to Approve Lease Agreement") simultaneous with the commencement of the Chapter 11 liquidation proceedings. The Motion to Approve Lease Agreement sought the court's approval of a Lease Sale Agreement entered into between Anna's Linens, Inc. ("Anna's") and the debtors pursuant to which Anna's was granted the right to purchase some or all of the debtors' retail, non-residential real property leases. The court approved the terms of the Lease Sale Agreement in an order dated November 1, 2005. The debtors' sale of the non-residential real property leases to Anna's generated $400,000 in proceeds (the "Lease Proceeds").

13. The Creditors' Committee filed its Complaint generally seeking a declaratory judgment determining the extent, priority, and validity of the defendants' liens in the debtors' property and the amount of their claims.

14. Specifically, in its first cause of action, the Creditors' Committee argues that the Lenders did not validly perfect their interests in the debtors' non-residential real property leases such that their liens do not extend to the Lease Proceeds.

15. Similarly, the Creditors' Committee argues that the Lenders' liens do not extend to the Augment Goods because the

6

debtors never owned such goods. Consequently, the Creditors' Committee asserts that the $300,000 in proceeds generated from the sale of the Augment Goods is property of the debtors' estate.

16. In their Motion to Dismiss, the defendants contend that both the Lease Proceeds and the proceeds from the sale of the Augment Goods fall within the Lenders' pre-petition and post-petition collateral such that the Lenders are oversecured.

17. In its second cause of action, the Creditors' Committee asserts that the Lenders are not entitled to the termination fee because they are undersecured by virtue of not having a perfected lien on the Lease Proceeds and proceeds from the sale of the Augment Goods.  In the alternative, the Creditors' Committee argues that the fee is not reasonable under § 506(b) because it is a "windfall" to the Lenders who will otherwise receive 100% of their claims while the unsecured creditors may not receive any dividend.

18. In contrast, the Lenders argue that this cause of action fails to state a claim because the termination fee is reasonable under applicable state law and, therefore, it is presumptively reasonable under § 506(b).  In addition, the Lenders point out that the debtors have projected a distribution that will pay all unsecured creditors a dividend of between 3.2

7

and 9.9% after payment of the early termination fee and administrative, priority, and secured claims in full.

19. Finally, in its third cause of action, the Creditors' Committee seeks to equitably subordinate the Lenders' claims to those of the general unsecured creditors under 11 U.S.C. § 105(a).

## CONCLUSIONS OF LAW

20. The court will treat the defendants' Motion to Dismiss as one for summary judgment and will dispose of the motions as provided in Rule 56 of the Federal Rules of Civil Procedure. Rule 12(b)(6) allows a court to convert a motion to dismiss into a motion for summary judgment where the parties have "reasonable opportunity" to present all pertinent materials. See Herbert Saffell, 877 F.2d 267, 270 (4th Cir. 1989). The plaintiff is not prejudiced by this conversion since it filed a motion for summary judgment and, therefore, had the opportunity to submit appropriate documentation under Rule 56.

21. Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056. The court has determined that there are no genuine issues of material fact and that judgment must be granted to the defendants with respect to all three causes of action.

22. The Creditors' Committee does not contest that pursuant to the Loan Agreement, the debtors granted the Agent, for the benefit of the Lenders, a continuing lien and security interest in all of their presently existing and future arising or acquired assets, including "general Intangibles," Accounts" and "Accounts Receivable," "Leasehold Interests" and "proceeds" thereof.  Moreover, the Creditors' Committee does not challenge the fact that the Agent properly perfected its liens and security interests by filing UCC-1 financing statements.

23. Rather, the Creditors' Committee argues that the Agent does not hold a perfected security interest in the Lease Proceeds or proceeds from the sale of the Augment Goods because (1) the debtors did not own the Augment Goods and (2) the Agent did not take the appropriate steps to perfect its security interest in the debtors' non-residential real property leases because the underlying asset involved realty.  The Creditors' Committee asserts that pursuant to state law, the defendants should have registered the leases in the county where the land lies rather than filing UCC-1 financing statements.

24. However, the proceeds were generated from pre-petition contracts between the debtors and Gordon Brothers and the debtors and Anna's, and those contract rights fall within the scope of Article 9.

25. The debtors' rights under the contracts can be classified as an "account," which is defined as "a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of [or] (ii) for services rendered or to be rendered . . . ." See U.C.C. § 9-102(2).

26. The definition of "accounts" was expanded under the Revised Article 9 to incorporate a wide variety of rights to payment, including the right to payment of proceeds from the sale of real property where the real property "'has been or is to be sold'" as well as the right to payment for goods sold. See In re Nittolo Land Development, 333 B.R. 237, 240-241 (Bankr. S.D.N.Y. 2005). Moreover, the 1972 amendments to the U.C.C. extended the definition of "accounts" to encompass contract rights. See In re Scheidmantel Olds-Cadillac, Inc., 144 B.R. 296, 297 (Bankr. W.D.Pa. 1992); see also In re Tops Appliance City, Inc., 372 F.3d 510, 514 (3rd Cir. 2004) (contract right to proceeds from the sale of leases fall under Article 9 definition of "account"). Thus, the debtors' contract rights to the Lease Proceeds and the proceeds from the sale of the Augment Goods can be classified as an "account" under U.C.C. § 9-102(2).

27. Because the court has determined that these contract rights are an "account," the court will not consider whether the contract rights also fall within the U.C.C. definition of "general intangibles". Whether the debtors' contract rights are considered "accounts" or "general intangibles," it is clear that it was the intention of all parties involved for the Agent to take a security interest in all of the debtors' assets so that the debtors' could fund their plan of reorganization.

28. With respect to the leases which were sold to Anna's, case law firmly establishes that the debtors' contractual right to sell the leases was personalty to which the Lenders' Article 9 security interest attached, despite the fact that the underlying asset to be sold was a lease of real property. See e.g. Nittolo, 333 B.R. at 241 (definition of account includes the right to payment of proceeds from the sale of real property); Tops Appliance, 372 F.3d at 512 (proceeds from sale of lease was a contract right or account in which lender held a perfected security interest); Mastro v. Witt, 39 F.3d 238, 241 (9th Cir. 1994) (noting that courts generally agree that an interest in a land sale contract is subject to Article 9 of the U.C.C.).

29. Because the court has determined that the Lenders had a duly perfected lien on the Lease Proceeds and proceeds from the sale of the Augment Goods, the court finds that the Lenders

11

are oversecured. Therefore, the court will not disallow the early termination fee on the basis that the Lenders are undersecured.

30. In the alternative, the Creditors' Committee contends that the early termination fee is unreasonable pursuant to § 506(b). In determining the reasonableness of a termination fee, the court must apply a two part test: (1) the fee must be valid under state law and (2) reasonable under § 506(b). See Noonan v. Fremont Financial (In re Lappin Electric Company, Inc.), 245 B.R. 326, 329 (Bankr. E.D.Wis. 2000). Neither party challenges the validity of the termination fee under state law. Therefore, the court will decide whether the fee is reasonable under § 506(b).

31. Section 506(b) provides as follows:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection(c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b).

32. The court notes from the outset that the reasonable standard of § 506(b) in the context of pre-payment clauses is a "safety valve which must be used cautiously and sparingly as [should] all discretionary powers that are not subject to close scrutiny and statutory standard." See In re Financial Center,

140 B.R. 829, 839 (Bankr. E.D.N.Y. 1992). In addition, the court hesitates to alter the plain terms of the Loan Agreement because it was entered into between sophisticated parties who were represented by counsel and previously has been approved by this court.

33. Other courts have approved fee structures similar to the one set forth in the Loan Agreement. For example, in Lappin, the court held that a termination fee calculated on the same sliding scale as the one at issue was reasonable and enforceable under § 506(b). See Lappin, 245 B.R. at 330—331. Similar to this case, the debtor terminated a revolving line of credit of $7,500,000 prior to its three-year maturity, triggering payment of a termination fee of $225,000. The Lappin court approved the termination fee holding that it was not so large as to be considered a penalty. See id.

34. In contrast, the bankruptcy court in In re Kroh Bros. Dev. Co., 88 B.R. 997, 1001-1002 (Bankr. W.D.Mo. 1988), held that a prepayment fee which equaled 25% of the principal amount of the loan was exhorbitant and unreasonable. However, the court concluded that a 10% prepayment penalty would be considered reasonable. See id. at 1002; but see Financial Center, 140 B.R. at 839 (holding that a 25% charge was high but not unreasonable).

35. The court concludes that the early termination fee is reasonable under all of the circumstances present here. The Lenders undertook substantial risk and negotiated an agreement in that context. The early termination provision was approved by the court. It is reasonable in principle and in amount, and should be enforced by its terms.

36. With respect to the plaintiff's third cause of action, in order to subordinate the defendants' claim under § 510(c), the plaintiff must show that the following three conditions have been satisfied: (1) the claimant engaged in inequitable conduct; (2) the misconduct injured other creditors or gave the claimant an unfair advantage; and (3) subordination is consistent with other provisions of the Bankruptcy Code. See In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir. 1977); accord In re ASI Reactivation, 934 F.2d 1315, 1320 (4th Cir. 1991). The plaintiffs have not set forth any facts supporting a finding of inequitable conduct by the defendants. Therefore, the court denies the plaintiff's claim for equitable subordination.

It is therefore **ORDERED** that:

1. The plaintiff's Motion for Summary Judgment is DENIED.

2. Summary Judgment is GRANTED in favor of the defendants with respect to all three causes of action in the plaintiff's Complaint.

**This Order has been signed electronically.**     **United States Bankruptcy Court**
**The judge's signature and court's seal**
**appear at the top of the Order.**